# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Simon Osagi Iyawe, and
Alicia Nichole Iyawe,

Civ. No. 18-2625 (JNE/BRT)

Plaintiffs,

v.

Jefferson Beauregard Sessions, III,[1]
Attorney General of the United States;
Kirstjen Nielsen,[2] Secretary of the
Department of Homeland Security; and
L. Francis Cissna, Director of U.S.
Citizenship and Immigration Services,

**REPORT AND
RECOMMENDATION**

Defendants.

Thomas R. Anderson, III, Esq., Anderson & Anderson Law, LLC, counsel for Plaintiffs.

Friedrich A. P. Siekert, Esq., U.S. Attorney's Office, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

Plaintiffs Simon and Alicia Iyawe filed this case seeking judicial review of the

final action by the United States Citizenship and Immigration Services ("USCIS")

denying Alicia's I-130 spousal visa petition filed on behalf of her husband, Simon. The

USCIS denied the petition based on the determination that Simon had entered into a prior

---

[1]    William P. Barr, the current United States Attorney General, is substituted as a named Defendant under Fed. R. Civ. P. 25(d).

[2]    Chad Wolf, the Acting Secretary of Homeland Security, is substituted as a named Defendant under Fed. R. Civ. P. 25(d).

marriage with Ms. Yolanda Kilpatrick for the purpose of evading the immigration laws. This matter is now before the Court on cross motions for summary judgment brought by Plaintiffs Simon and Alicia Iyawe, and the Government Defendants as listed above. For the reasons stated below, this Court recommends that Plaintiffs' motion be denied and the Government Defendants' motion be granted.

## BACKGROUND

Plaintiff Simon Iyawe is a Nigerian citizen and first entered the United States with a B2 visitor visa on August 11, 1985, authorized to remain in the United States until late 1985 or early 1986.[3] (Doc. No. 12, Am. Compl. ¶ 3; Doc. No. 21, Administrative Record ("AR") 12, 4537, 4579–80.) Plaintiff Alicia Iyawe is a United States citizen who has been married to Simon since 2012. (AR 82.)[4] On August 5, 2003, Alicia filed a Form I-130 petition for Simon, which is the petition on review here. (Am. Compl. ¶ 21.) A Form I-130 petition is the first step in the process whereby a United States citizen may apply for an immigrant visa for their non-citizen spouse from USCIS. 8 U.S.C. §§ 1154(a) and (b); 8 C.F.R. § 204.2(a). This was the fifth petition filed on behalf of Simon since 1986. (Am. Compl. ¶ 21.)

---

[3]    The record reflects that the B2 visa expired on November 4, 1985. (AR 1426, 4537.) His stay may have been extended into 1986, as another document reflects that he was "a deportable alien since February 11th, 1986." (AR 2614.)

[4]    Although the Complaint states they had been married since 2011 (Am. Compl. ¶ 4), the marriage certificate says 2012. (AR 82.)

## A.    The First Form I-130

The first Form I-130 filed on behalf of Simon was filed by Yolanda Kilpatrick, a woman who Simon married on September 15, 1986; this form (signed on October 17, 1986) was filed on October 22, 1986. (Am. Compl. ¶ 12; AR 12, 1458–59, 1463, 4568, 4572.) At that same time, Simon filed an I-485 Application for Permanent Residence. (AR 1443–45.) During an interview by Immigration and Nationalization Service ("INS")[5] on February 17, 1987, the INS officer noted a number of discrepancies in Ms. Kilpatrick's and Simon's testimony. (AR 15, 2404, 4600.) This included differing information about who attended their wedding and differing information and evidence of what their address was. (AR 2404, 4600.) Thereafter, in June 1988, Ms. Kilpatrick executed a sworn affidavit before INS officers, which stated that she received a $300 payment for marrying Simon along with other items, and that she never lived with Simon. (AR 1701–02, 4570–71; Am. Compl. ¶ 13.) She also stated that she saw Simon pay an individual named Marie $200, and that Marie had told her the money was for "finding" Ms. Kilpatrick. (AR 1701, 1711, 4570.) Specifically, Ms. Kilpatrick stated:

> I heard later that the reason I had to marry him was so he could get his green card. I agreed to do that and later we got married and he paid me $300. He also bought me a stereo that cost $177 and a bicycle for $59. I saw him pay Marie $200 and she told me that that was what she got for finding me. When I met him there was another man, Pride Osa, present, and he was also at our marriage ceremony. I used to see Simon a pretty good bit until after we went to Memphis for an interview. He told me he would pay

---

[5]    Since 2003, the USCIS implements the Immigration and Nationality Act; prior to 2003, the INS performed those duties. (*See* Doc. No. 39, Defs.' Mem. in Supp. of Mot. to Dismiss 6, n. 3.) In this Report and Recommendation, the Court will not differentiate between USCIS and the INS, and will instead refer to both entities as either "USCIS," "INS," or the "Service."

me another $400 after the interview in Memphis but he never did. I never lived with him and was told the green card was for him to get a passport to go overseas. He also made me bring some clothes over to his house. I know three people who did this as well . . . all married people as well.

(AR 2401.)

Ms. Kilpatrick withdrew the I-130 petition in writing on June 16, 1988 (Am. Compl. ¶ 13; AR. 1600, 1605–06, 4570–71), and the INS terminated it on June 24, 1988. (AR. 1600, 1603–04, 4568–69.) The INS also denied Simon's I-485 on June 24, 1988. (AR 1586–88; 4575; 4580–82.)

**B.    The Second Form I-130**

On January 31, 1989, Ms. Kilpatrick filed a second Form I-130 on behalf of Simon. (Am. Compl. ¶ 15; AR 12, 265–69 1428; 2711–12.) A Notice of Intent to Deny was issued by INS two years later on January 17, 1991, stating that the intent to deny was because it had determined that Simon entered into a sham marriage with Ms. Kilpatrick. (Am. Compl. ¶ 15; AR 12, 251, 1427, 4091.) Later that month, Ms. Kilpatrick responded to the Notice and retracted her earlier statement from 1988, stating that she loved Simon, that she signed the earlier affidavit because of tension in her marriage, and that she was prepared to answer any questions about the marriage. (AR 12, 1426, 4562.) INS scheduled and rescheduled interviews with Ms. Kilpatrick and Simon on three occasions, but neither of them attended for various reasons. (AR 12, 4556–60.) Around that same time, an Immigration Judge subpoenaed Ms. Kilpatrick to appear as a witness in Immigration Court, and she did not appear. (AR 4, 2495, 2614, 3243.) INS denied the I-

130 petition on April 23, 1991, and no appeal was filed.[6] (Am. Compl. ¶ 15; AR 12, 249–50, 4545–56.)

### C.    The Third Form I-130

Ms. Kilpatrick filed a third Form I-130 for Simon on June 28, 1991. (Am. Compl. ¶ 16; AR 13, 247–48.) This Form I-130 was filed with a different INS service center than the previous forms. On July 25, 1991, the INS granted the I-130. (AR 13, 247–48, 1351.) In October 1991, Simon then moved to reopen deportation proceedings based on the third I-130. (AR 13.) The motion to reopen was granted, and Simon requested adjustment of status before an Immigration Judge. (AR 13, 2460.)

It appears that sometime thereafter, while Simon's adjustment of status request was pending, INS determined that when making its decision on the I-130 petition, it did not have the first and second I-130 denials to review when making its decision. (AR 13, 2467–68.) Therefore, on March 15, 1993, INS issued a Notice of Intent to Revoke the third I-130 based on the following: (1) Ms. Kilpatrick's withdrawal of the first Form I-130 and her sworn affidavit that supported a finding of a sham marriage; (2) the subsequent statements provided by Ms. Kilpatrick that were in contrast to her earlier affidavit; (3) the lack of medical documentation confirming an alleged miscarriage;[7] and (4) Ms. Kilpatrick's failure to disclose Simon's name as her husband when applying for a

---

[6]    Three days later, an Immigration Judge granted Simon an extension, allowing for a period of voluntary departure until October 26, 1991. (AR 13, 1345.)

[7]    Ms. Kilpatrick's mother, Patricia Sawyers, signed an affidavit on July 8, 1992, stating that at some point within that year Ms. Kilpatrick and Simon suffered a miscarriage. (AR 4333–35.)

recertification of public assistance. (AR 13, 3963–64.) Three months later, in June 1993,

Ms. Kilpatrick and Simon divorced.[8] (AR 13, 1883–87, 4400–04.) On July 14, 1993, INS

revoked Ms. Kilpatrick's third I-130 petition. (Am. Compl. ¶ 17; AR 243–46.) In so

doing, the INS determined that Ms. Kilpatrick failed to rebut the evidence that she and

Simon had entered into a sham marriage, and therefore found that approval of the I-130

petition was barred under INA § 204(c). (AR 13, 1520–22.)

      **D.      The Fourth Form I-130**

      On June 13, 1998, Simon married Joyce Isoken Nehikhare ("Ms. Nehikhare").

(AR 13, 1882, 4398.) Ms. Nehikhare filed a Form I-130 for Simon in December 2000.

(AR 13, 184, 193–95, 1862–64, 2987.) After interviews of the couple in May 2001

(AR 13, 4387–91), and an additional written statement provided by Simon regarding his

and Ms. Kilpatrick's marriage (AR 15, 2910–11), and after another review of the record,

INS issued a Notice of Intent to Deny the I-130 on July 11, 2001. (AR 184–86, 2987–89.)

INS determined that the record contained substantial and probative evidence that Simon's

---

[8]      Meanwhile, on March 26, 1993, Simon withdrew his application for adjustment of status and requested a suspension of deportation in Immigration Court instead. (AR 13, 2494–95, 2624.) The Immigration Court denied Simon's suspension of deportation but granted him an extension for voluntary departure by August 26, 1993, and alternatively ordered deportation if he did not voluntarily deport by then. (AR 13, 2446–49, 2624.) Simon appealed the denial of his request for suspension of deportation to the Board of Immigration Appeals ("BIA"). (AR 13, 1296–1298, 2620–22.) On December 8, 1999, the BIA affirmed the Immigration Court's decision, granted him a new period of voluntary departure for thirty days, and later extended that voluntary departure period to August 1, 2003. (AR 13, 1915.)

previous marriage to Ms. Kilpatrick was entered into to evade immigration laws. (AR 184–86, 2987–89.)

Ms. Nehikhare submitted a response on August 15, 2001, asserting reasons for why Ms. Kilpatrick's affidavit should be given little weight and why her later statements should be given more weight. (AR 133–41, 2921–29, 2933–34.) Simon also submitted a signed affidavit, dated August 8, 2001, stating he "really thought [the] marriage [with Ms. Kilpatrick] would work," and that it was only during his marriage that he learned that Ms. Kilpatrick was struggling with a drug addiction. (AR 4139.) In an undated document, Simon stated that he met Ms. Kilpatrick at a night club (which contradicted Ms. Kilpatrick's statement that she first met Simon at Marie's house). (AR 4140.) He stated that they dated for nine months before marrying. (AR 4140.) He stated that Victor Igbinedion and Phyllis Peterson were the two friends present at their wedding (which contradicted Ms. Kilpatrick's statement). (AR 4140.) He also stated that prior to their 1987 interview with INS, he and Ms. Kilpatrick started to have marital problems, mostly due to her drug use. (AR 4140.) Sometime between 1989 and 1991, Simon moved from Tennessee to live in St. Paul; he states that his wife joined him shortly after, but that she moved back to Tennessee "after deeming the people in Minnesota to be very racist." (AR 4141.)

The INS issued a second Notice of Intent to Deny on July 23, 2002, stating that it considered Ms. Nehikhare's response but that it did not overcome the substantial and probative evidence that Simon's marriage to Ms. Kilpatrick was fraudulent; INS referred specifically to a number of things that supported that finding. (AR 1263–69, 2400–06.)

Simon submitted an affidavit and the affidavits of his sister and a social worker, and

Ms. Nehikhare filed a response to the second Notice of Intent to Deny. (AR 15, 1773–77,

1817–21, 2361–86.) On May 30, 2003, INS/USCIS denied the I-130 petition, finding that

Ms. Nehikhare had not overcome the evidence of fraud in Simon's previous marriage to

Ms. Kilpatrick; the INS/USCIS explained its reasoning and listed several areas of

inconsistencies in the record and other support for its finding. (AR 115–24, 2790–99.)

Ms. Nehikhare appealed the I-130 denial to the BIA, and on January 26, 2005, the

BIA affirmed the USCIS denial. (AR 292–93, 3396.) The couple later divorced in May

2008.[9] (AR 746–64.)

### E.    The Fifth Form I-130

On June 29, 2012, Simon married Alicia.[10] (AR 82.) Alicia Iyawe filed an I-130

petition on behalf of Simon on August 5, 2013. (Am. Compl. ¶ 21; AR 77–86.) USCIS

officers interviewed Alicia and Simon on July 10, 2014 (Am. Compl. ¶ 21; AR 73–74,

76), and a few months later issued a Notice of Intent to Deny the I-130 on November 7,

2014. (Am. Compl. ¶ 21; AR 21–27.) The Notice stated that Alicia's petition appeared

subject to INA § 204(c) due to substantial and probative evidence that the Simon/Ms.

Kilpatrick marriage was entered into to evade immigration laws. (AR 21–27.)

Specifically, the Notice contained the following analysis:

> It is apparent that from the onset of this case, there have been good reasons
> to question the validity of [] Simon's marriage to Yolanda. As

---

[9]    Simon and Ms. Nehikhare had two children together during their marriage.
(AR 748.)

[10]    The couple had twin sons in 2012, and a third son two years later. (AR 39.)

acknowledged in Simon's September 20, 2002 notarized affidavit, at the time that Yolanda filed the first Form I-130 the Service was conducting ongoing operations in the Nashville, TN area. According to a service official, the operation was predicated by Nigerian marriage fraud problems they were having in the area. The official stated he worked in one housing project where Pride Osa and Mary Scales had recruited destitute young black women to marry aliens for money. The service official confirmed that Pride Osa and Mary Scales were real individuals and that their names were not made up.

The record shows that on February 17, 1987, an officer of the Service interviewed Yolanda and Simon separately in connection with the first Form I-130. During that interview: 1) Simon stated that Yolanda's aunt and his friend, Pride, attended the wedding ceremony; 2) Yolanda stated that only Simon's friend attended the wedding ceremony; 3) Yolanda and Simon claimed to be living at . . . (Whispering Hills); 4) Yolanda claimed to be living at Whispering Hills since June 1986, but on the date of the interview, presented a copy of a car title for a 1973 Pontiac showing her address as . . .; and 5) despite owning a car, Yolanda presented a social security card as identification because she claimed not to have a driver's license. The interviewing officer noted that Pride, the individual that Simon claimed to have attended the wedding ceremony, had also accompanied Ise [F. E.] to his marriage to another United States citizen. A review of the Ise [F. E.]'s file shows that Pride's complete name is Pride Osa. Further review of the record shows that Ise [F. E.]'s spouse withdrew her Form I-130 claiming that she "was paid $300 to marry him".

At the conclusion of the May 30, 2001, interview, Simon submitted a written statement wherein he claimed that his friends, Victor [I.] and Phyllis [P.], attended his court wedding to Yolanda. The written statements submitted by Simon on May 30, 2001, contradicts the sworn testimony he gave on February 17, 1987, where he stated that Yolanda's aunt and Pride attended the wedding ceremony. In response to a second NOID, Simon submitted a notarized affidavit dated September 20, 2002, where he now claimed that: 1) he does not remember how many people were present at the wedding ceremony or who, for certain, was there; 2) he does not know anyone by the name of Pride; 3) he does not know why the name appears in his interview notes; and 4) he believes the examiner got the name wrong or wrote something he said because of his bad accent at the time.

In response to the first and second NOIDs, Joyce argued that Yolanda's withdrawal statement is not conclusive proof rising to the level of substantial and probative because it has been rebutted. Yolanda's

withdrawal statement, in the presence of two Service officers, gave very specific details describing a sham marriage in great specificity. In contrast, the letter submitted by Yolanda in 1991, Yolanda's 1992 affidavit, and Yolanda's 2001 notarized statement recanting Yolanda's withdrawal statement are of questionable probative value. Yolanda's 2001 notarized statement, wherein she claimed to have made up some of the names of the people she identified in her withdrawal statement as having been involved with marriage fraud has been discredited by the fact that Pride Osa and Mary Scales are real people. The fact that Pride Osa and Mary Scales have been linked to marriage fraud in a Service operation gives credence to Yolanda's June 16, 1988 withdrawal statement. The fact that Pride Osa and Mary Scales are not made up names further discredits Yolanda's 2001 notarized statement. Yolanda's 1992 affidavit was not notarized nor dated, and the record reflects that it was not received by the IJ during deportation proceedings. Yolanda's claim in the 1992 affidavit that Service officers scared her into not helping Simon is without merit. Yolanda's general claim of duress is insufficient to retract her detailed admissions as to the fraudulent nature of her marriage to Simon. Yolanda's 1991 letter, is general in nature, and despite Joyce's asserts to the contrary, does not contain any language about INS officers pressuring Yolanda into making the withdrawal statement.

In Joyce's response to the second NOID she questioned the reliability of Yolanda's June 16, 1988, withdrawal statement. Specifically, she claimed that Yolanda's withdrawal statement did not rise to the level of substantial and probative evidence because: 1) Yolanda did not write the withdrawal statement; 2) the facts contained in the withdrawal statement are flawed; and 3) it has been undermined by Yolanda's subsequent actions. Although, it appears that Yolanda did not write the withdrawal statement, Yolanda has never denied signing the withdrawal statement. When Yolanda signed the withdrawal statement, she acknowledged that the statement was true. Therefore, absent of evidence to the contrary, Joyce's allegations of flaws contained in the withdrawal statement must be attributed to Yolanda. Joyce's claim that subsequent actions by Yolanda, namely the filing of the second and third Form I-130 and the recantation statements, have undermined the withdrawal statement would have held more merit if Yolanda had been willing to appear before a Service officer to discuss her Form I-130 filings and recantations.

The record shows that Yolanda has never been willing to appear in person before a Service officer to recant her withdrawal statement under oath. The record shows that in connection with her second Form I-130 Yolanda failed to appear for an interview before a Service office on at least two different

occasions. The record also shows that despite having been issued a subpoena to appear to testify under oath about her relationship to Simon, Yolanda failed to attend Simon's deportation hearing. Yolanda's refusal to recant her withdrawal statement under oath continues to be the trend. In her 2001 notarized statement, Yolanda states, "we are divorced and I don't want to deal with Simon or my marriage to him anymore". Yolanda has also refused to contact this Service, despite being asked to do so by mail on June 17, 2002. Specifically, Yolanda refused to claim a certified letter from this Service. The fact that Yolanda has never been willing to appear in person before a Service officer to recant under oath her withdrawal statement seriously impacts the probative value of her recantation. Thus, Joyce failed to overcome the substantial and probative evidence of fraud present in the record.

The record further shows that Yolanda has a criminal record that spans from November 25, 1981, to August 19, 2000 . . . individuals with Yolanda's criminal history are more likely to be involved in fraud that individuals who are law abiding . . . . Although it is not common practice for individuals to check someone's criminal history before dating or marrying them, it is difficult to conceive how an educated individual like Simon did not sense Yolanda's lifestyle until 2 to 3 months after their marriage, in light of the fact that they started dating 9 months before their marriage.

The record shows that in response to the first NOID Joyce submitted copies of statements from the Internal Revenue Service (IRS) dated in 1997 showing that Yolanda and Simon paid income taxes as evidence of their bonafide marriage. In her response to the second NOID, she clarified that the IRS statements were not submitted to show that in 1997 Simon lived with Yolanda, but rather to show that Simon was making payments for joint taxes owed during the period he and Yolanda were married to each other. In his September 20, 2002, notarized affidavit, Simon acknowledges that in 1997 he was making payments for past due taxes for joint income taxes he filed with Yolanda from 1986 through 1992. The record is not clear as to when the joint income taxes were filed. Since the Service is not able to ascertain when the joint filing took place, this evidence has very little probative value i[s] establishing the bonafides of Simon's marriage to Yolanda.

The record also shows that in response to the first NOID, Joyce submitted an affidavit from Yolanda's mother, Patricia [S.] ("Patricia"), dated on July 8, 1992, and evidence from the Third National Bank of a joint account in 1991. Patricia's affidavit and the evidence from the bank were considered

by the IJ during Simon's deportation proceedings and found to be not overwhelming since there was no real documentation that Yolanda and Simon had lived together since 1987. Likewise, the Service finds that Patricia's affidavit and the evidence from the bank to be not overwhelming since there is no real documentation that Yolanda and Simon had lived together since 1987. The remaining evidence Joyce submitted in response to the first and second NOID, namely affidavits from: 1) Simon; 2) Madam I. H. [I.], Simon's mother; and 3) Felix [E.], Simon's close friend, were considered and found to be self-serving and of limited probative value because of the history of this case.

In view of the above, it is hereby determined that the evidence in the record is substantial and probative, and it shows that Simon attempted to obtain an immigration benefit by virtue of his marriage to Yolanda. This is supported in the record by: 1) Yolanda's June 16, [1988], withdrawal statement before officers of the Service; 2) the evidence developed in connection with the second and third Form I-130; 3) inconsistencies noted during the first Form I-130 interview; 4) the fact that Pride Osa and Mary Scales are real people and not made up names; 5) the fact that Pride Osa and Mary Scales have been linked to marriage fraud in a Service operation; 6) inconsistencies noted with the evidence submitted in response to the first and second NOID; 7) the fact that Yolanda has been involved in criminal activity in the past; 8) the fact that Yolanda did not list Simon as her husband when applying for public benefits; 9) lack of evidence showing that Yolanda and Simon lived together after their marriage; and 10) the fact that Yolanda has never been willing to appear before a Service officer to recant, under oath, the affidavit that she signed, wherein she describes in great specificity her sham marriage to Simon.

According to INA section 204(c), no petition shall be approved if the alien has sought to obtain an immigration benefit based on marriage fraud. Since Simon has previously entered into a sham marriage to obtain immigration benefits, no new petition may be approved on his behalf.

A review of the record shows substantial and probative evidence to sustain the denial of the instant Form I-130. This bar to the approval of your petition on behalf of Simon Iyawe is based on the evidence in the record regarding his prior marriage and applies regardless of whether or not your marriage to him is determined to be bona fide and entered into without regard to immigration benefits.

(AR 24–27.)

Alicia submitted a response on December 5, 2014. (AR 29, 39–72.) In early 2015,

the USCIS denied Alicia's I-130 petition based on the evidence in the record of marriage

fraud in relation to Simon and Ms. Kilpatrick's marriage (AF 10–20,[11] 28–38), which

Plaintiffs appealed to the BIA. (AR 7.)

The BIA dismissed the appeal on August 9, 2018, finding no error in the USCIS

decision to credit Ms. Kilpatrick's 1988 affidavit rather than her subsequent recantations

and found the withdrawal statement constituted substantial and probative evidence that

INA § 204(c) barred approving Alicia's I-130 petition. (Am. Compl. ¶ 22; AR 1–6.) In so

doing, the BIA stated the following:

> On appeal, the petitioner does not dispute that Kilpatrick withdrew
> the aforementioned visa petition, nor does she dispute that Kilpatrick
> signed a sworn declaration at that time claiming that she married the
> beneficiary for money in order to help him obtain immigration status.
> Rather, she claims that Kilpatrick's sworn statement was false and that
> officers of the former Immigration and Naturalization Service (INS)
> pressured her into signing the statement, which she subsequently recanted.
> Further, the petitioner claims that the Director has imposed unreasonable
> evidentiary demands given the length of time that has passed since
> Kilpatrick withdrew her visa petition. We find these arguments
> unpersuasive.
>
> After receiving Kilpatrick's withdrawal statement and subsequent
> recantations, the former INS repeatedly sought clarification by seeking her
> sworn testimony, both in subsequent visa petition proceedings and in the
> beneficiary's deportation proceedings, going so far as to obtain a subpoena
> from an Immigration Judge compelling her to testify. Yet Kilpatrick
> disregarded these opportunities to clarify her story, failed to appear for
> interviews or as a witness, and ultimately was divorced from the
> beneficiary and expressed a desire to have nothing further to do with him or
> his immigration case. Under the circumstances, we find no error in the

---

[11]    The USCIS decision provides much of the same analysis that was provided in the
November 7, 2014 Notice of Intent to Deny the I-130 quoted above. (*See* AR 24–27.)

Director's decision to credit Kilpatrick's initial withdrawal statement rather than her subsequent recantations.

Kilpatrick's withdrawal statement constitutes substantial and probative evidence supporting the Director's determination that approval of the current petition is prohibited by section 204(c) of the Act . . . . Further, although we recognize the difficulties inherent in trying to refute old evidence, there is no "statute of limitations" on the section 204(c) prohibition; even old sham marriages trigger the bar.

(AR 3–4.)

Plaintiffs thereafter filed a Complaint (and later an Amended Complaint) with this federal court to review the BIA's decision regarding the fifth I-130 petition. (Doc. Nos. 4, 12.) Specifically, Plaintiffs allege that the Defendants violated both the INA and the APA when denying the I-130 petitions of record based on Ms. Kilpatrick's 1988 statement that her marriage with Simon was fraudulent without considering the various factors surrounding the initial INS interviews with Ms. Kilpatrick and Ms. Kilpatrick's statements, and without investigating the alleged coercion and duress in relation to Ms. Kilpatrick's statements. Plaintiffs also allege that the denial of Alicia's I-130 petition violates their Fourteenth Amendment right to due process by denying them their fundamental rights to life, liberty, and the enjoyment of marriage, citing *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). Now before the Court are the parties' cross motions for summary judgment.[12] (Doc. Nos. 37, 41.)

---

[12]    Plaintiffs acknowledge that "there are no disputes to the material facts of the case." (Doc. No. 41, Pls.' Cross Mot. for Summ. J. 9.)

## DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate if, "after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011) (quotation omitted). In ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A disputed fact is material when its resolution "might affect the outcome of the suit under the governing law," and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2001) (quotations omitted). If it does so, the non-moving party may not rest on mere allegations or denials, but must point to evidence of "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *see also* Fed. R. Civ. P. 56(c)(1). Conclusory assertions, standing alone, are not enough to create a genuine issue of material fact. *See Bennett v. Nucor Corp.*, 656 F.3d 802, 820 (8th Cir. 2011). Where the evidence "could not lead a rational trier of fact

15

to find for the nonmoving party, there is no genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

    **B.**    **Scope of Review**

    The Iyawes' claims are brought under the judicial review provisions of the Administrative Procedure Act ("APA"). Under the APA, the reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375–76 (1989); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The Court considers whether defendants made a "clear error of judgment" when considering any relevant factors. *Motor Vehicles*, 463 U.S. at 43. This standard of review is narrow and gives agency decisions a high degree of deference. *Sierra Club v. Envtl. Prot. Agency*, 252 F.3d 943, 947 (8th Cir. 2001). An agency's rule is arbitrary and capricious if it (1) relied on factors Congress did not intend it to consider; (2) "entirely failed to consider an important aspect of the problem"; (3) offered an explanation that runs counter to the evidence before the agency; or (4) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles*, 463 U.S. at 43. The agency need only show "a rational connection between the facts found and the choices made." *Id.* (quotations omitted).

### C.     Denial of the Fifth I-130 Petition

The Immigration and Naturalization Act ("INA") permits United States citizens to apply for an immigrant visa for their non-citizen spouses. *See* 8 U.S.C. § 1151(b)(2)(A)(i) (defining "immediate relatives" to include spouses of citizens); 8 U.S.C. § 1154(a) (permitting any United States citizen claiming that an alien is entitled to immediate relative status to file petition). First, the United States citizen must file a Form I-130 petition, which is what Alicia Iyawe did here for her husband Simon. 8 U.S.C. §§ 1154(a) and (b); 8 C.F.R. § 204.2(a). After the petition is filed, the government must conduct an investigation. 8 U.S.C. § 1154(b). In an adjudication of an I-130 by USCIS, the burden of proving eligibility remains with the petitioner. 8 U.S.C. § 1361; *Bremer v. Johnson*, 834 F.3d 925, 927 (8th Cir. 2016).

If the government determines that the facts stated in the petition are true and the alien is an immediate relative, the petition must be approved. 8 U.S.C. § 1154(b). If, however, "the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States . . . by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws," the petition must be denied. 8 U.S.C. § 1154(c); *see also* INA § 204(c).

In a case involving marriage fraud under INA § 204(c), the court may set aside a decision that is not supported by substantial and probative evidence. 8 C.F.R. § 204.2(a)(1)(ii); *Bangura v. Hansen*, 434 F.3d 487, 502–03 (6th Cir. 2006). Under this standard, "findings of fact are 'conclusive unless any reasonable adjudicator would be

compelled to conclude to the contrary.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) (stating that the evidence must "compel" an alternate conclusion before reversing the BIA).

Here, the government denied Alicia's I-130 petition, the fifth filed on Simon's behalf, because the marriage between Simon and Ms. Kilpatrick had been previously determined to have been entered into for the purpose of evading the immigration laws. The Iyawe's assert that the denial of Alicia's I-130 petition is arbitrary, capricious, and an abuse of discretion because it "entirely failed to consider an important aspect of the problem" when it disregarded the circumstances that surrounded Ms. Kilpatrick's 1988 statement and disregarded the 1991 recantation of Ms. Kilpatrick, which Plaintiffs assert was credible. (Doc. No. 41, Pls.' Cross Mot. for Summ. J. 15.) In particular, Plaintiffs assert that Ms. Kilpatrick was under duress when she made her original statements about being paid to marry Simon, and that it was known that Ms. Kilpatrick was a drug user and "often acted in ways in which to jeopardize her partner." (Am. Comp. ¶¶ 34, 37.) Plaintiffs also assert that "Ms. Kilpatrick did not have an attorney present, nor did she have the capacity to understand or know the legal implications of what her actions would cause for the two of them," and that "Ms. Kilpatrick stated she felt coerced, and out of fear, perhaps because of her drug use, signed the document." (Am. Comp. ¶ 38.) Plaintiffs claim it was an abuse of discretion for USCIS to not have investigated Ms. Kilpatrick's statement that she felt coerced, and instead focus on her statement where she accused Simon of fraud. (Am. Comp. ¶ 39; Pls.' Cross Mot. for Summ. J. 15–16.)

18

They contend that the fact that Ms. Kilpatrick and Simon remained married for several years and then moved to Minnesota together in 1991 is evidence supporting that Ms. Kilpatrick's recantation was genuine. (Am. Comp. ¶ 35.) Plaintiffs argue that based on all the evidence, including their assertion that Ms. Kilpatrick was coerced and under duress when she signed the earlier statement, the earlier statement should have been "removed from the file and given insignificant weight in evaluating future petitions." (Am. Comp. ¶ 43.)

Defendants assert that the Service's denial of Alicia's I-130 did not violate the APA or the INA because it was not arbitrary, capricious, or unlawful, and substantial and probative evidence supported it. Defendants point out that the Court, on its review of the Service's decision, is confined to the question of whether the USCIS and the BIA properly found that the record contained substantial and probative evidence of marriage fraud at the time that Simon and Ms. Kilpatrick were married. Defendants contend that the USCIS and the BIA, on review of the entire record when considering the fifth I-130 petition, provided a reasonable explanation for why Ms. Kilpatrick's 1988 statements were more credible than the later recantations, and that because the explanations were supported and reasonable, the finding of marriage fraud was neither arbitrary nor capricious. In addition, Defendants argue the Service provided Plaintiffs with the legal reasoning for its decision, which included an explanation of the evidence in the record it relied on and an explanation that because the evidence indicated that Simon and Ms. Kilpatrick's marriage was fraudulent, INA § 204(c) required the USCIS to deny Alicia's I-130 petition.

Defendants are correct that the key question for this Court on review of the Service's decision is whether there is substantial and probative evidence in the record to support the Service's finding that Simon's marriage to Ms. Kilpatrick was entered to evade immigration laws. *See Sabhari v. Reno*, 197 F.3d 938, 943–44 (8th Cir. 1999) (stating that after concluding that the APA provided a foundation for review of the case, the Court was then to determine whether substantial evidence supported the BIA's order). This Court concludes that substantial evidence exists supporting the decision.

Contrary to Plaintiffs' assertion, it is evident that the Service thoroughly reviewed Alicia's petition, the testimony, and the entire record evidence. (AR 10.) The Service considered more than just Ms. Kilpatrick's 1988 statement itself. It considered the circumstances around all of the prior I-130 petitions. Simply put, the Service considered Ms. Kilpatrick's later statements and found them less credible than her 1988 statement. The Service explained that Ms. Kilpatrick's 1988 statement was very detailed and specific, while the later statements were less probative. Among the evidence that the Service considered was the following:

- Ms. Kilpatrick admitted to marrying Simon so he could get a green card and in exchange for $300, a $117 stereo, and a $59 bicycle.

- Ms. Kilpatrick stated that she saw Simon pay Marie $200 "for finding me."

- Ms. Kilpatrick stated, among other things, that Pride Osa was present when she met Simon and when they were married.

- Ms. Kilpatrick stated that she used to see Simon "a pretty good bit until after [they] went to Memphis for an interview."

- Ms. Kilpatrick stated that Simon promised "to pay [her] another $400 after the interview in Memphis but he never did."

20

- Ms. Kilpatrick stated she never lived with Simon; Simon made her bring some clothes over to his house.

- Ms. Kilpatrick identified three other women who also married people.

- Pride Osa and Mary Scales were involved in the marriage between Simon and Ms. Kilpatrick and they were known to the Service as being connected to an immigration fraud operation.

- No evidence of leases, rental agreements, or home ownership paperwork indicating Simon and Ms. Kilpatrick lived together.

- Ms. Kilpatrick's 1991 letter stating that she loved Simon, that she signed the 1988 statement due to tension in her marriage, and she was ready to answer any questions about her marriage.

- Ms. Kilpatrick's 1992 unsworn affidavit (not dated, not notarized, not received by Immigration Court during proceedings at the time) attempting to retract her 1988 statement.

- The circumstances around the unsuccessful attempts to schedule an interview with Ms. Kilpatrick.

- Ms. Kilpatrick's failure to appear under oath before the Service at any time to recant her 1988 statement.

- Ms. Kilpatrick's criminal history from 1981 to 1990, observing that individuals with similar criminal histories were more likely to be involved with fraud than law-abiding individuals.

- Simon and Ms. Kilpatrick divorced in 1993.

- The third and fourth I-130 petitions and the evidence and circumstances surrounding those petitions.

- Inconsistencies in the record regarding testimony that Ms. Kilpatrick and Simon gave at the initial I-130 interviews about who attended their wedding, their addresses, and Ms. Kilpatrick not having a driver's license while claiming that she owned a car.

- In 1992, Ms. Kilpatrick listed no husband on her application for public benefits.

- Simon's 2001 written statement and 2002 affidavit in the record contradicted his 1987 interview testimony and other record evidence.

- Simon's statement that he did not know of Ms. Kilpatrick's lifestyle until two to three months after their marriage, finding that unbelievable since they had dated for nine months before their marriage.

- The IRS statements offered to show that Simon and Ms. Kilpatrick filed taxes jointly during periods when they were married, finding they had low probative value because the record was not clear what years they had filed jointly.

- A 1992 affidavit from Ms. Kilpatrick's mother.

- Evidence from the Third National Bank of a joint account from 1991.

- Lack of evidence that Simon and Ms. Kilpatrick actually lived together after 1987.

- Affidavits that Ms. Nehikhare filed in support of the fourth I-130 petition.

- Evidence submitted by Alicia in support of the fifth I-130 petition, noting no new evidence showing that Simon's marriage with Ms. Kilpatrick was not fraudulent.

(AR 12–17.)

Plaintiffs assert that "evidence was provided to prove that the derogatory statement by Ms. Kilpatrick was given under duress," and that she was "pressured to revoke the I-130 Petition." (Pls.' Cross Mot. for Summ. J. 24.) However, Plaintiffs do not point to any actual evidence to support that she was under duress or pressured. Lack of attorney being present at the time Ms. Kilpatrick signed her statement in 1988 does not in itself indicate coercion or duress. Nor do they have any support for the conclusion that the Service did not review the entire record. As summarized above, the Service not only reviewed Ms. Kilpatrick's 1988 statement and examined other relevant evidence that related to that statement, but it also considered the other evidence in the record, including

that evidence that weighed in Simon's favor. Here, the Service's credibility determination relating to Ms. Kilpatrick's statements ultimately was not only permitted, but was supported by the evidence.

On review, this Court "is not permitted to re-weigh the evidence, but is instead limited to determining whether the agency's determination that the record contained substantial and probative evidence of marriage fraud was arbitrary and capricious." *Ginters v. Dooley*, No. 07-4681, 2011 WL 2961499, at *6 (D. Minn. July 20, 2011). Although it is true that there is some evidence in the record to suggest that Simon and Ms. Kilpatrick's marriage could have been bona fide (or became more bona fide over time), on balance the BIA's order finding that the marriage was a sham marriage was reasoned and supported by substantial and probative evidence, and therefore it was not arbitrary and capricious. *See Ghaly v. INS*, 48 F.3d 1426, 1434–35 (7th Cir. 1995) (noting that plaintiff's ex-wife's statement that their marriage "was fraudulent" and that she agreed to marry him for money was "the crucial evidence" marking the marriage as fraudulent, and agreeing that the "INS's decision was rational and had substantial evidentiary support, and was thus neither arbitrary nor capricious").

When there is substantial and probative evidence of an attempt to enter into a marriage for the purpose of evading the immigration laws, as the BIA concluded, the I-130 visa petition must be denied (*see* 8 C.F.R. § 204.2(a)(1)(ii)), and 8 U.S.C. § 1154(c) then forecloses the possibility of a visa petition ever being approved on behalf of the alien. *See Santos v. Gonzales*, 204 Fed. App'x 711, 712 (9th Cir. 2006) ("By statute, relief is barred where a noncitizen has been a party to any sham marriage in the past,

regardless of whether his current marriage is bona fide.") (citing 8 U.S.C. § 1154(c)). Here, the 1988 statement, along with other evidence of record, supported a finding of marriage fraud and therefore INA § 204(c) and 8 U.S.C. § 1154(c) applied.

Therefore, for all of the above reasons, this Court concludes that the Service's denial of the I-130 petition submitted by Alicia was not arbitrary and capricious, and Defendants are entitled to summary judgment on the Plaintiffs' claims relating to judicial review of that denial.[13]

## D.    Constitutional Claim

The only remaining claim in Plaintiffs' Amended Complaint is thus their constitutional claim. Plaintiffs assert that, "USCIS and DHS are violating Plaintiff's 14th Amendment right of due process because Plaintiffs are being deprived their fundamental right to life and liberty to enjoy in the benefits of marriage." (Am. Compl. ¶ 24.) Plaintiffs cite to *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), to support their claim.[14]

Plaintiffs' argument, however, relies on finding that the I-130 petition was not based on all of the facts and evidence and improperly denied. (*See* Pls.' Cross Mot. for Summ. J. 23–24 ("The *improper denial* infringes upon Mrs. Iyawe's fundamental right to life and liberty through her marriage.") (emphasis added).) Because this Court concludes

---

[13]    This includes Plaintiffs' claims asserted under the headings "Violation of the [I]mmigration and Nationality Act" and "Violation of the Administrative Procedure Act." (*See* Am. Compl. 7–8.)

[14]    In *Obergefell*, the Supreme Court held that the Fourteenth Amendment required states to license same sex marriages and to recognize same sex marriages lawfully licensed and performed in other states. *Id.* at 2604–05, 2607–08.

that the I-130 petition denial was supported by facts and substantial and probative

evidence in the record, it was not improperly denied. Therefore, Plaintiffs' Fourteenth

Amendment argument fails.[15]

## CONCLUSION

This Court does not doubt that, as Plaintiffs state, "Mr. Iyawe has a positive,

deeply rooted, 34-year presence in the United States," nor does this Court doubt that

Mr. and Mrs. Iyawe's marriage and love for one another is genuine. (Pls.' Cross Mot. for

Summ. J. 6.) And while this Court may not understand why the Service did not arrange

for Simon's deportation during the course of the past 34 years after extensions for periods

of voluntary departure expired, those unanswered questions do not determine the

---

[15]     Because Plaintiffs' Fourteenth Amendment argument fails for the reason stated
above, this Court need not address Defendants' remaining arguments relating to
Plaintiffs' constitutional claim. This Court notes, however, that the Fourteenth
Amendment applies only to state action, not actions of the federal government. *Barrera v.
United States Dep't of Homeland Sec.*, No. 07-3879 (JNE/SRN), 2009 WL 825787, at *8,
n.10 (D. Minn. Mar. 27, 2009) ("The Fourteenth Amendment . . . applies only to the
states and not to the federal government."). In addition, the named Defendants are federal
officials sued in their official capacities, and Plaintiffs have not alleged or identified a
statute that waives sovereign immunity for constitutional violations committed by the
United States or federal officials in their official capacities while acting in the scope of
their employment. *See V S Ltd. P'ship v. Dep't of Housing and Urban Dev.*, 235 F.3d
1109, 1112 (8th Cir. 2000) (stating that in an action against the United States, the plaintiff
"must show both a waiver of sovereign immunity and a grant of subject matter
jurisdiction"). Sovereign immunity shields the federal government and its agencies from
suit, absent a Congressional waiver. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). To the
extent Plaintiffs have alleged a constitutional tort claim, the United States has not waived
its sovereign immunity for such claims. *See id.* at 478; *see also Nyanjega v. Douglas*,
No. 17-cv-1685 (SRN/SER), 2018 WL 8224881, at *12 (D. Minn. Dec. 4, 2018)
("Because Plaintiffs have failed to identify any waiver of sovereign immunity by the
United States and a grant of subject matter jurisdiction over the claims presented by
Plaintiffs, Plaintiffs constitutional claims must be dismissed.").

outcome of this Court's review. The Court's review today is narrow. The issue today is
whether there is substantial and probative evidence in the record showing that
Mr. Iyawe's marriage to Ms. Kilpatrick was entered into—at that time—for the purpose
of evading immigration laws. This Court finds that there is substantial evidence in the
record to support that finding, and therefore recommends affirming that finding and
granting Defendants' motion for summary judgment.

### RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Defendants' Motion to Dismiss and for Summary Judgment (Doc. No. 37)
be **GRANTED** and the Amended Complaint be dismissed.

2.      Plaintiffs' Cross Motion for Summary Judgment (Doc. No. 41) be
**DENIED**.

3.      Judgment be entered accordingly.


Date: July 6, 2020

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the
District Court and is therefore not appealable directly to the Eighth Circuit Court of
Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written

objections to a magistrate judge's proposed finding and recommendations within fourteen (14) days after being served a copy" of the Report and Recommendation. A party may respond to those objections within fourteen (14) days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.